UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Oct 31 9 20 AM '01

JAMES A. FLANIGAN,

  Plaintiff,

  v.           Docket No. 2:01-CV-9

TOWN OF COLCHESTER and
SGT. D. ALLEN

  Defendants.

**OPINION AND ORDER**

Plaintiff James A. Flanigan, ("Flanigan") filed suit against Defendants the Town of Colchester ("Colchester") and Sgt. D. Allen ("Allen") based upon various claims of misconduct alleged to have occurred on June 27, 2000 when Allen took Flanigan into protective custody. Flanigan alleges that Allen violated his rights under the United States and Vermont Constitutions. Specifically he claims denial of due process, unreasonable search and seizure, use of excessive force, and cruel and unusual punishment in violation of his Fourth, Eighth, and Fourteenth Amendment rights under the United States Constitution and 42 U.S.C. § 1983.[1] Flanigan also brings a number of claims under

---

[1] Presumably Flanigan also alleges violation of analogous provisions of the Vermont Constitution found under Chapter I, Articles 1, 4, 10, and 11. However, he mentions the Vermont Constitution generally in his complaint without identifying

1

Vermont common law: negligence, negligence per se, common law assault and battery, and intentional infliction of emotional distress. Finally, Flanigan seeks to hold Colchester liable for each claim under a theory of "vicarious liability." Allen and Colchester have each moved for summary judgment on all of the counts against them. For the reasons stated below, the Court grants both summary judgment motions.

I. **Background**

Because this case is before the Court on Defendants' motions for summary judgment, the following facts are undisputed or taken in the light most favorable to Flanigan, the non-moving party. On the afternoon of June 27, 2000, the Colchester Police Department received a complaint from George Frazier ("Frazier") that he was being threatened by Flanigan, his neighbor, with a firearm. Shortly thereafter Colchester Police Department Detectives Mark Jacobs ("Jacobs") and Pete Hull ("Hull") arrived at the scene and met with Frazier and a witness. They learned that Flanigan had crossed the fence line between the two residences and asked Frazier to turn down the volume on his daughter's stereo. This led to an argument between the two,

---

specific articles: "Allen has caused plaintiff to suffer injuries but [sic] not limited to pain and suffering, mental and emotional distress and interference with rights protected and guaranteed under both the United States and *Vermont Constitutions*." Compl. ¶ 15 (emphasis added).

2

after which Flanigan left Frazier's property. Flanigan then returned to the fence line with a firearm. Flanigan did not point the gun at Frazier, however, when he saw Flanigan holding the gun Frazier immediately ran into his house and dialed 911.

Officers Allen, Jacobs, and Hull went to Flanigan's residence. At this point Flanigan admitted to the officers that he had confronted Frazier about the music and the officers confirmed that the firearm involved had been a BB gun. While speaking with Flanigan, Jacobs and Allen both observed that Flanigan appeared to be intoxicated. Flanigan's speech was slurred, his eyes were bloodshot and watery, his gait was slow and deliberate, and there was a moderate odor of intoxicants on his breath. Flanigan admitted during his deposition that he had been drinking earlier that day. Allen Dep. at 28 (Paper 36, Ex. C).

After speaking further with Flanigan both Allen and Jacobs concluded that Flanigan was incapacitated. Allen asked Flanigan to submit to a preliminary breath test, but he refused. Allen then informed Flanigan that he was being taken into custody as an incapacitated person.[2] He asked Flanigan to place his hands

---

[2] Flanigan was taken into protective custody pursuant to Vt. Stat. Ann. tit 33, § 708(b)(2001), which provides that: "When a law enforcement officer encounters a person who, in the judgment of the officer, is incapacitated as defined in section 702 of this title, the person shall be taken into protective custody by the officer." Incapacitated is defined as the state of intoxication in which an individual "appears to need medical

3

behind his back.

At this point Flanigan and the officers were standing in Flanigan's driveway, just outside of his garage. Three police cars were located at the other end of the driveway and Flanigan was standing in front of Allen and Jacobs. Flanigan was initially cooperative and placed his hands behind his back to be handcuffed. However, as Allen was holding Flanigan's right arm and reaching for his handcuffs, Flanigan said "no," and shook his hands. Flanigan then took a few steps away from Allen toward the door of his house.

Allen and Jacobs both state that their law enforcement training requires them to immediately "take to the ground" and handcuff a person who becomes non-compliant while being placed in custody. Allen Aff. ¶ 5 (Paper 36, Ex. A); Jacobs Dep. at 20 (Paper 36, Ex. B). Accordingly, as Flanigan was stepping away from him, Allen took him to the ground by knocking Flanigan's feet out from under him and grabbing him around the chest. Flanigan landed on his right side on the ground. Flanigan

---

care or supervision by approved alcohol treatment personnel . . . to assure his safety; or . . . he appears to present a direct active or passive threat to the safety of others." Vt. Stat. Ann. tit 33, § 702(9)(A),(B)(2001). While Flanigan's complaint includes a claim of unreasonable search and seizure under the Fourth Amendment, as discussed below at Part III, he did not address this claim in his response to the Plaintiffs' motions for summary judgment. Thus Flanigan no longer appears to dispute the officers' determination that he was in need of protective custody under Vt. Ann. Stat. tit. 33, § 708(b).

4

contends that his shoulder, hip, and face hit the ground.

Flanigan alleges that Allen's arms remained around his chest while he was on the ground, suggesting that Allen fell on top of Flanigan during the take-down.[3] At this point Flanigan's arms were pinned under him. Allen released pressure at Flanigan's request to permit him to free his hands and replace his eye glasses, which had fallen off during the struggle. At the instruction of Allen and Jacobs, Flanigan placed his hands behind his back and was handcuffed. They then helped him into a sitting and then standing position.

After Flanigan was secured, the officers took Flanigan to ACT 1, an alcohol treatment facility that screens individuals for incapacitation and arranges safe housing for them until they are sober. At ACT 1, Flanigan was evaluated by Martina Ainsworth ("Ainsworth"), a licensed drug and alcohol counselor and member of an alcohol crisis team. Ainsworth's evaluation was conducted through an incompletely rolled down window while Flanigan was still in the police cruiser. At this time Flanigan continued to refuse to submit to a breath test. However, Ainsworth determined

---

[3] The record is unclear as to Allen's hold on Flanigan during the take-down. Allen states that he used a non-complaint hold, which kept Flanigan's right arm in his grasp during the take-down, not the bear hug that Flanigan alleges. Allen Dep. at 11, 18 (Paper 36, Ex. D). However, for the purposes of the summary judgment motion, Allen has stipulated that he will accept Flanigan's version of what transpired during the take-down. Sergeant Allen's Local Rule 7.1 Statement of Undisputed Material Facts at 3 n.1 (Paper 36).

5

that Flanigan was intoxicated, that he presented a danger to himself and others, and was in need of protective custody. Flanigan was then admitted to the Chittenden Community Correctional Center ("Correctional Center") and was held there for about twenty-four hours prior to being released.

On December 20, 2000 Flanigan filed the present lawsuit against Allen and Colchester in Lamoille Superior Court in Vermont. Allen and Colchester removed the case to this Court on January 11, 2001 and filed motions for summary judgment on all counts on August 8, 2001.

## II. Standard for Summary Judgment

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue as to a material fact exists when the evidence requires a factfinder to resolve the parties' differing versions of the truth at trial. Id. at 249 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, not every alleged factual dispute is sufficient to defeat a motion for summary judgment. Anderson, 477 U.S. at 427-28 ("the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

The moving party has the initial burden of coming forward with those parts of the record it feels demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). When evaluating a motion for summary judgment, the court is required to view the evidence in the light most favorable to the nonmoving party. Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988). However, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III. Discussion

While Flanigan included a variety of federal, state, and common law claims in his complaint, in his response to the motions for summary judgment, Flanigan addressed only the federal excessive force claim. Accordingly, summary judgment is granted by default to Allen and Colchester on the remaining claims.

7

Local R. 7.1(a)(6) (when no opposition is filed to a motion, it is deemed unopposed and may be granted by the Court). Thus, the Court must address only Flanigan's federal claim of excessive force against Allen and Colchester. For the reasons discussed below, the Court grants the Defendants' motions for summary judgment on this excessive force claim.

**A. Allen's Motion for Summary Judgment**

Allen has raised two defenses to the excessive force claim: (1) the force used was not excessive, and (2) he is entitled to qualified immunity. The Court grants Allen's request for summary judgment on the excessive force claim based on both of these defenses.

**1. Excessive Force**

In order to prevail on his excessive force claim, Flanigan must prove that the force used against him was objectively unreasonable under the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 395 (1989)("*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.")(emphasis in original). In Graham the Supreme Court instructed that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." Id. at 396. In particular the Supreme Court

cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97. Thus, in evaluating the reasonableness of an officer's use of force, a court should consider the specific circumstances of the case, such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." Id. at 396; accord Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000)(per curiam).

There is virtually no factual dispute between the parties as to the actual force used. The parties agree that after Flanigan told the officers "no," shook his hands, and took a few steps away from the officers, Allen knocked his feet out from under him, grabbed him around the chest, and forced him to the ground. The issue in contention is whether the force used was reasonable.

Following the guidance set forth in Graham, it is clear that Allen acted with reasonable force under the circumstances. By shaking his hands free from Allen and moving away from him, Flanigan was actively evading the officers' attempts to place him in protective custody. Flanigan argues that he presented little risk of escape because "[t]here was nowhere for him to run."

9

Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 5 (Paper 39) (hereinafter "Pl.'s Opp'n"). Allen and Jacobs testified, however, that Flanigan could easily have fled to his house to procure a weapon.

Moreover, as Flanigan broke away from him, Allen had reason to be concerned that the suddenly uncooperative Flanigan might present a danger to the officers, himself, or others. The complaint that prompted the officers' arrival at Flanigan's house involved a weapon, albeit a BB gun. Although Flanigan was not armed at that moment, the confrontation took place in the driveway near his garage and he admits that he was headed to the door of his house when he broke free. Allen had also determined that Flanigan was incapacitated due to consumption of alcohol. Thus, his behavior was likely to be uncontrollable and irrational.

Flanigan suggests that the injuries he suffered as a result of the take-down indicate that Allen used excessive force against him. There is some disagreement between the parties as to the extent of these injuries. Flanigan alleges that he "had immediate visible marks on his arms," that "[h]e had cuts and scrapes all over his body," and that his face and right hand were in pain and his muscles ached. Pl.'s Statement of Material Facts ¶¶ 16, 17 (Paper 39). In addition, Flanigan alleges that he suffered a fractured right orbit bone when his face hit the

10

ground.  This injury was not identified, however, until July 20, more than three weeks after the incident.  Also, Allen points out that the fracture could not be confirmed without a CT scan and that Flanigan never had this procedure performed.

With regard to Flanigan's injuries, Allen points to Ainsworth's testimony that she did not observe any injuries to Flanigan when she evaluated him.  However, Ainsworth observed Flanigan from outside the police car through an incompletely rolled down window.  Ainsworth also testified that Flanigan told her he was unhurt.  Finally, Allen notes that the Correctional Center admitted Flanigan without requiring medical clearance and that it will not accept any detainees who exhibit or complain of injuries without such clearance.

Even viewing the allegations of injury in the light most favorable to Flanigan, the cuts, scrapes, and muscle aches he allegedly suffered are not so severe as to suggest the use of excessive force.  While the fractured right orbit bone is more serious, it is not a surprising result of a reasonable police response to Flanigan's conduct.  Cf. Kent v. Katz, 462 F.Supp.2d 450, 462 (D. Vt. 2001) (summary judgment for defendants inappropriate because plaintiff's severe injury was combined with other factors suggesting excessive force, including evidence that defendant did not resist arrest, no allegation of a crime involving violence or the threat thereof, and officers' awareness

11

of defendant's arthritis and that the force was causing defendant pain).

In sum, given the rapidly changing situation facing Allen and the undisputed facts known to him at the time he was taking Flanigan into custody, no reasonable jury could, on the basis of the facts alleged by Flanigan, find that Allen's use of force in restraining Flanigan was unreasonable. Accordingly, Allen's motion for summary judgment is granted.

**2. Qualified Immunity**

The privilege of qualified immunity protects law enforcement officers from facing suit, not merely liability. <u>Saucier v. Katz</u>, __ U.S. __, 121 S.Ct. 2151, 2156 (2001) (citing <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)). As the Supreme Court recently reiterated in the context of an excessive force claim, determining whether a law enforcement officer is entitled to qualified immunity under federal law involves a two-step inquiry: "first . . . whether a constitutional right would have been violated under the facts alleged; second, assuming the violation is established, . . . whether the right was clearly established." <u>Id.</u> at 2155. As to the second step, 'clearly established' requires that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 2156. At the summary judgment stage, the defense of qualified immunity is appropriate when "the only conclusion a rational jury

could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances." Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).

As discussed above, the constitutionality of the use of force by law enforcement officials under the Fourth Amendment is assessed under a standard of objective reasonableness. Graham, 490 U.S. at 388. The Court has already determined that Allen's use of force was reasonable. Accordingly, it is unnecessary to consider the second qualified immunity inquiry – that is whether Allen "'reasonably' acted unreasonably." Id. at 2157 (quoting Anderson v. Creighton, 483 U.S. 635, 643 (1987)).

However, even if Allen's use of force were found to be unreasonable under the circumstances, Allen had the requisite "substantial grounds . . . to have concluded he had legitimate justification under the law for acting as he did." Id. at 2159-60. The Supreme Court did not provide a clearly established rule in Graham. Id. at 2158. It noted, however, that "'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or the threat thereof to effect it.'" Id. at 2160 (quoting Graham at 396). In this case, Flanigan's sudden uncooperativeness in combination with his movement away from the officers, his apparent intoxication, and the earlier threat with a BB gun gave Allen more than enough justification for assuming that taking Flanigan

13

to the ground would be "within the bounds of appropriate police responses." Id.

As Flanigan identifies no case presenting a "clearly established rule" prohibiting Allen's response, a rational jury would have to conclude, at the very least, that reasonable officers could disagree about the legality of force under the circumstances. Because Flanigan cannot show that Allen deprived him of a constitutional right or that he had a clearly established right to be free of Allen's use of force, the Court must grant Allen summary judgment on the defense of qualified immunity.

**B. Colchester's Motion for Summary Judgment**

Colchester argues that it is not liable for the excessive force claim because Flanigan has failed to allege facts demonstrating the existence of an official policy or custom that deprived him of his Fourth Amendment right to be free of excessive force. The Court agrees.

Reliance on the theory of respondeat superior is not sufficient for the imposition of liability under 42 U.S.C. § 1983. Monell v. Dep't Soc. Servs., 436 U.S. 658, 691 (1978). Instead, to prevail on his excessive force claim under § 1983, Flanigan must show that he was deprived of his constitutional right as a direct result of an official municipal policy or custom. See id. at 694; Zahra v. Town of Southold, 48 F.3d 674,

685 (2d Cir. 1995); Kent, 146 F.Supp.2d at 457. The Court has already determined that Allen did not violate Flanigan's constitutional rights under the Fourth Amendment. Thus, at the outset Colchester cannot be liable under § 1983.

However, even if the Court had found a deprivation of Flanigan's constitutional rights, Flanigan has presented no evidence that would allow the Court to conclude that Colchester had an official policy or custom encouraging or permitting its police officers to use excessive force in violation of federal law. An official policy is one in which "a deliberate choice to follow a course of action is made . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986). However, the policy need not be part of an "explicitly adopted rule or regulation." Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992). The inclusion of "custom" along with "policy" recognizes that the practices of government officials can, "[a]lthough not authorized by written law[,] . . . be so permanent and well settled as to constitute a 'custom or usage' with the force of law." Monell, 436 U.S. at 691 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)); see generally Pangburn v. Culbertson, 200 F.3d 65, 71-72 (2d Cir. 1999)

(discussing evidence plaintiffs might present to show such an unwritten policy exists).

Accordingly, § 1983 liability can attach to a municipality for a practice, as opposed to an official policy, authorized by an official with policy-making responsibility. Pangburn, 200 F.3d at 71-72. It can also attach to a practice established by subordinate employees, if there is constructive acquiescence by senior policy-making officials. Sorlucco, 971 F.2d at 870. In addition, failure to properly train police officers can create a custom or policy for purposes of § 1983 liability, if such failure is tantamount "to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1979); accord Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992).

Regardless of whether Flanigan alleges an official policy or an unwritten custom, at the summary judgment stage he must set forth specific facts supporting this allegation. See Dwares v. City of New York, 985 F.3d 94, 100 (2d Cir. 1993) ("The mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations tending to support, at least circumstantially, such an inference."). Flanigan's sole basis for claiming an official policy or custom is the testimony of Jacobs and Allen that their law enforcement training instructed them to immediately "take to the ground" and handcuff

16

any individual who is non-compliant while being taken into custody.

Even if Colchester had adopted this policy, a policy of taking someone to the ground when he or she defies arrest is not facially unconstitutional. Cf. Monell, 436 U.S. 658 (holding that local government units were liable for damages resulting from an unconstitutional policy requiring pregnant employees to take unpaid leaves of absence regardless of medical necessity). Such a policy would seem sensible, particularly in the Fourth Amendment context where "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.

Moreover, Flanigan has alleged no facts suggesting that this training constituted a "deliberate" decision by a Colchester official with final policy-making authority over the police department. In fact, he has not alleged any facts suggesting that any Colchester official has adopted, authorized, or acquiesced in the use of the training instruction.[4] Finally, he

---

[4] Flanigan claims that "[b]oth [Jacobs and Allen] stated over and over that it is their training as police officers, *which has been in the town of Colchester*, that if a person is not compliant, they go down." Pl.'s Opp'n at 5 (emphasis added). However, none of the statements by the officers cited by Flanigan in support of this allegation indicate that the training was provided by Colchester or the Colchester Police Department. Thus it is unclear whether the officers were in fact referring to training provided by Colchester or to other

17

has not claimed that the allegedly faulty training constitutes "deliberate indifference" to the rights of citizens.

In sum, not only has Flanigan failed to allege facts sufficient to show that Allen used excessive force in placing him in protective custody, he has failed to implicate a Colchester policy or custom in his allegation of excessive force. Thus, the Court must also grant Colchester's motion for summary judgment against Flanigan.

## IV. Conclusion

Wherefore, the Court rules as follows: Defendant Allen's motion for summary judgment is **GRANTED**. Defendant Colchester's motion for summary judgment is **GRANTED**.

CASE CLOSED.

Dated at Burlington, Vermont this 31st day of October, 2000.

William K. Sessions, III
United States District Court

---

non-local training.